Commonwealth *v.* Stanton et al., Appellants.

48

Argued June 9, 1975. Before WATKINS, P.J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Paul A. Kelly,* submitted a brief for appellant. at No. 655.

*Gerald C. Grimaud,* for appellant at No. 813.

*Edward P. Little, Jr.,* District Attorney, submitted a brief for Commonwealth, appellee.

OPINION BY VAN DER VOORT, J., March 29, 1976:

Appeals are taken to this Court from judgments of sentence rendered following jury trial and verdict of guilty as to a charge of burglary, appellants having been adjudged not guilty of charges of theft.[1] Post-trial motions were denied.

Shortly before midnight (11:30 P.M. or 11:45 P.M.) on Saturday night, August 18th, 1973, Gerald Hinkley, Vaughn Howell, aged 24 at the time, and David Stanton were drinking in a tavern known as Red's Diner in or near Springville Township, Susquehanna County. Howell was in urgent need of money to make back-payments for the support of his wife. He had been summoned into Court on the matter and was to appear in a few days. Howell asked Hinkley if he wanted to buy some cattle. Hinkley said he would like to look at them and Howell and Stanton got into Howell's car and Hinkley got into a pick-up truck which he had with him. The pick-up truck was towing a trailer for transporting horses. They set out for a barn which was rented and operated by Dale Brown, 28 years of age, in Elk Lake. They stopped at John Arnold's place where Hinkley left his truck and got into Howell's car. They drove to Dale Brown's barn to

---

1. "Crimes Code," Act of 1972, Dec. 6, P.L. 1482, 18 Pa.C.S. §§3502 and 3921, respectively.

which the nearest house was 250 to 300 feet away, arriving shortly after midnight. Howell let Hinkley out at the barn, pulled on down the road, turned around and came back up to the barn shining his lights into the milkhouse and the barn. They all three went into Brown's barn and Howell pointed out a Charolais beef cow weighing from 1050 to 1100 lbs. and worth $700.00.

After looking at the Charolais cow, the three of them proceeded to the barn of Roger Sherman where Howell pulled up beside the barn so that his lights were shining into it. Hinkley and Howell entered the Sherman barn and after a few minutes came out and all three returned to Brown's barn, stopping on the way for Hinkley to pick up his truck and bring it to a knoll approximately 500 feet from the barn. All three went into the barn. They put an improvised rope halter on the Charolais cow and led and pushed her out of the barn by an exit through the milkhouse which adjoined the barn. Just outside the milkhouse was a cornfield and the Charolais cow bolted, entangling David Stanton and dragging him into and through part of the cornfield. The other two subdued the cow and led her to Hinkley's truck where she was loaded onto it. The three men proceeded again to the barn of Roger Sherman. They entered the barn and carried out four calves of the value of $320.00 which they loaded into Hinkley's trailer.

Hinkley gave Howell a check payable to cash for $150.00. Thereafter they parted.

The next morning Sherman discovered that four of his calves were missing and notified the Pennsylvania State Police around 7:00 A.M. Brown discovered that his Charolais beef cow was missing around 8:00 A.M. that morning and also filed a complaint with the State Police.

The Pennsylvania State Police made immediate investigation and inquiry. They learned that Hinkley, Howell and Stanton had been seen together in the South Montrose area, that Hinkley lived in Alcove, New York, and that the New York State Police Barracks nearest to

Alcove was in Selkirk. The Pennsylvania State Police then contacted the New York State Police who went over to Hinkley's horse farm and discovered that he had the Charolais cow and four calves. Hinkley immediately called Howell on this Sunday morning and asked him to destroy the $150.00 check. Arrests and charges of burglary and theft against appellant and Stanton followed.

Appellants were found guilty of burglary of Brown's barn and not guilty of burglary of Sherman's barn and not guilty of thefts. Howell was sentenced to 3 to 10 years and Hinkley to 2½ to 5 years' imprisonment.

Howell attempted to defend by claiming that Sherman owed him money for work that he had done for Sherman and had given Howell 4 cows (which he, Howell, was to select) and the Charolais cow. He claimed further that the total price which Hinkley was to pay him was $600.00. The balance was to be paid in two weeks. Hinkley attempted to defend that he did not know there was anything wrong with his transaction with Howell and that Howell had given him a bill of sale for the animals. However, Hinkley was unable to show any bill of sale to the New York State Police when they first came to Hinkley's horse farm in Alcove, New York. A bill of sale did appear some unspecified number of days later.

## APPEAL OF HOWELL

Appellant first argues that the Commonwealth failed to prove his unlicensed or unprivileged entry into the barns. This is the Commonwealth's burden of proof under §3502(a) of the "Crimes Code," *supra*, and the burden cannot be shifted to a defendant. *Commonwealth v. Stoffan*, 228 Pa. Superior Ct. 127, 149, 323 A.2d 318 (1974). Equally important as the prosecution's proving every element of a crime is the defense's raising timely objections, thus allowing the trial court to address itself to alleged trial errors. In the instant case, the question as to the burden of proving no license or privilege was not

presented timely either in Howell's points for charge or in his motion for new trial and is now waived. *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974).

Appellant complains of that part of the charge of the court which was as follows:

"A person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act or the volition (sic) to perform an act of which he is physically capable. A person is not guilty of an offense unless he acted intentionally, knowingly, recklessly or negligent (sic) as the law may require with respect to each material element of the case. Ignorance or mistake to a matter of fact to which there is a reasonable explanation or an excuse is defense if: 1. The ignorance or mistake negatives the intent, knowledge, belief, recklessness or negligence required to establish a material element of the offense or the law provides that the state of mind established by such ignorance or mistake constitutes a defense."

The trial judge was following sections 301, 302 and 304 of the Crimes Code. In his points for charge the appellant asked the judge to charge on sections 302 and 304. He cannot now complain that what the judge said misled the jury. Prior to that part of the charge quoted above, the judge cautioned the jury three different times that in order to convict any of the defendants (including appellant) they must believe that he took the animals "with the mind of a thief." Appellant cannot successfully contend that twelve mature men and women sitting on the jury did not know that taking something "with the mind of a thief" means to take it with an intent to steal it.[2]

---

2. The trial judge charged initially that the appellants were charged with two counts of burglary and two counts of theft. After defining the crime of burglary he informed the jury that the counts of theft meant they were charged with exercising "unlawful control over movable property of another with the intent to deprive him thereof."

The appellant claims that the judge's charge led the jury to believe that reckless or negligent conduct would supply the necessary intent of a burglar to commit a crime and should call for a new trial even though he requested the charge. Regarding the intent necessary to warrant a verdict of guilty of burglary the court, before reaching the points for charge submitted by appellant, charged the jury further:

"We are talking about intent. Did this and this is what the Commonwealth has got to prove, that he Vaughn Howell, took this cattle, this cow and these calves, with the mind of a thief. If he did he is guilty. If he didn't though and if his belief is such that a reasonable man could entertain, if that belief was reasonable, then of course you don't have the necessary intent or mind of a thief to deprive the owner thereof. The owner would be getting credit or value for the value of the calves or cow."

There was no objection to this part of the charge and no request that it be augmented. Notwithstanding the points requested by appellant we find nothing in this case indicating that the jury convicted the appellant or his co-defendant of burglary because they were reckless or negligent.[3]

Appellant next contends that it was error for the

3. The dissent in this case says that the points requested by counsel for appellant and the failure of counsel to ask for an enlarged definition of "intentionally" constitutes ineffective counsel. Appellant has new counsel in this appeal. In his brief appellant does not raise ineffective counsel on the grounds upon which the dissent bottoms its position. Appellant claimed in his brief that trial counsel was ineffective solely because he didn't secure the court's pre-sentence report for review prior to sentence and that appellant's sentence was delayed for an unreasonable time. In his "Reply Brief" appellant for the first time attempts to raise his claim of ineffective counsel as to the issues of (a) lack of proof (claimed to be inadequate by appellant but actually adequately proved) that the entry into Brown's barn was not licensed or privileged and (b) failure to request the judge to charge on culpability. Appellant cannot now belatedly raise additional reasons for ineffective counsel.

lower court to wait from November 8, 1973, the date of the verdict, until January 7, 1975, for sentencing. The docket records that the case did not lie dormant; - filings were made of the transcript, a petition to amend the record (on which hearing was held), the opinion and order denying new trial, and appellant's exceptions thereto. Also, a pre-sentence report was prepared. *Commonwealth ex rel. Holly v. Ashe*, 368 Pa. 211, 219, 82 A.2d 244 (1951), points out that "there is neither statute nor rule requiring that a court impose sentence during the term in which a defendant is convicted." If unnecessary delay occurs in the sentencing of an incarcerated defendant, a petition for habeas corpus is the corrective step. In the instant case, appellant was not incarcerated but was out on bail, he did not ask for any earlier sentence and was not prejudiced by any alleged delay in sentencing.

Appellant further argues that the lower court's refusal to permit his counsel to inspect and comment on the pre-sentence report is reversible error. *Pennsylvania Rule of Criminal Procedure* 1404 allows disclosure of this report to defense counsel for information and comment. The record is silent as to any reason for the court's refusal. Appellant should have had this right, although the refusal cannot be reversible error as it deals only with sentencing and not with the verdict. It is in regard to this issue that appellant raises his ineffectiveness of counsel claim, i.e., that counsel was ineffective in failing to obtain inspection of the report. We do not find this ineffectiveness of counsel but we do find that counsel should have been permitted to inspect and comment upon the pre-sentence report.

Finally, appellant argues severity of sentence, although admitting that the sentence was within statutory limits. He proposes that a co-defendant was not sentenced as severely as he. However this is no ground for reversing and/or modifying judgments of sentence. *Commonwealth v. Mangum*, 234 Pa. Superior Ct. 51, 334

A.2d 680 (1975). Sentencing is particularly the province of the trial court, and must not be upset without manifest abuse of discretion. We need not address ourselves to this issue because of our disposition of remand for re-sentencing.

## APPEAL OF HINKLEY

The sole claim of appellant in this appeal is that the charge of the court constituted basic and fundamental error, however, no objection to the court's charge was made by counsel during the trial. Therefore this claim was waived and we are precluded from considering it. *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974); *Pa.R.Crim.P. 1119(b)*.

As to the Appeal of Hinkley at No. 655 October Term, 1975: Judgment of sentence affirmed.

As to the Appeal of Howell at No. 813 October Term, 1975: The case is remanded to the court below for re-sentencing, at which re-sentencing the attorney for the Commonwealth and counsel for appellant may inspect and comment upon the pre-sentence report, pursuant to Rule 1404, *Pa.R.Crim.P.* At the time of the imposition of the new sentence the present sentence shall be vacated.

DISSENTING OPINION BY HOFFMAN, J.:

The appeals of co-defendants Vaughn Howell and Gerald Hinkley have been consolidated. Counsel for appellant Hinkley raises only one claim — that it was "basic and fundamental error for the Court below to charge the jury that the Appellant could be found guilty of burglary and/or larceny through reckless or negligent behavior." As implied by the statement of the issue involved, counsel did not object to the lower court's charge during trial. Under the express terms of Pa.R.Crim.P. 1119(b) and of *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974), the claim is thereby waived. For the reasons stated in Judge SPAETH's opinion, however, I would reach the merits of his appeal.

Appellant Howell is represented on appeal by counsel other than his trial attorney. In a supplemental brief, new counsel challenges the effective assistance of trial counsel on the ground that the jury instructions proffered by appellant's trial counsel misstated the law and thereby misled the jury. Because I believe that the claim of ineffective assistance is properly raised and is meritorious, I would reverse and grant both appellants a new trial.

On October 15, 1973, the appellants and David Stanton, who testified at trial on behalf of the Commonwealth, were indicted on two counts of burglary and two counts of theft. Appellants were tried on November 7, and 8, 1973. A jury acquitted them of one count of burglary and one count of theft. Appellants, however, were found guilty of the burglary of Dale Brown's barn. Post-trial motions were filed on November 13, 1973; they were finally denied on September 30, 1974. On January 16, 1975, the court sentenced appellant Howell to three to ten years' imprisonment and appellant Hinkley to two and one-half to five years' imprisonment.

The following are the facts adduced at trial in the Commonwealth's case-in-chief and on cross-examination of its witnesses:

The Commonwealth's first witness was Dale Brown, a dairy farmer who resided in Springville Township, Susquehanna County. At the time of the alleged burglary — August, 1973 — he was renting a one hundred acre farm from Esther Carlton, who lived in the farmhouse on the land. On August 18, 1973, Brown finished milking his cows at about 11:00 p.m. and turned his cows out to pasture. He left in the barn a Charolais[1] cow which he was fattening for slaughter.

At about 8:15 a.m., on August 19, Brown returned to the farm. He discovered that the door to the milkhouse,

---

1. Brown explained the cow's lineage: "The Charolais is a French breed of beef. This particular animal of mine was a cross between a Charolais, a pure-bred Charolais and a pure-bred Holstein."

located next to the barn, was open. Upon investigating further, he found that the Charolais cow was missing. Brown then called the State Police. Brown and Troopers Cobb and Barkowski followed the hoofprints of the cow, first into and then out of a cornfield next to the milkhouse. It was apparent that the cow had dragged someone through the field. The tracks eventually led to a hard-top driveway next to the barn. Within a matter of days, Brown received a call that his cow had been located on a farm in Selkirk, New York, near appellant Hinkley's home. Finally, Brown testified that he had known both appellants for many years.

The Commonwealth next called Roger Sherman to the stand. Sherman, also a dairy farmer in Springville Township, testified that on the morning of August 19, one of his employees informed him that some of Sherman's calves were missing. When he went to his barn, he found four empty stalls.

Sherman also explained that he had known appellants for years, and had traded cattle with them on numerous occasions. He admitted that he owed appellant Howell money both for work which Howell had performed and for a bill owed by Sherman which Howell had paid. Sherman also acknowledged that prior to August 19, he and Howell had discussed the possibility of Sherman paying Howell by giving him some calves, a form of payment that they had used in the past.

The third Commonwealth witness was David Stanton, originally cited as an accomplice. Some time around midnight on August 18, Stanton saw appellants in Red's Diner in South Montrose. As he stated at trial, "... Vaughn [Howell] came in and he said, Do you want to help me load some animals? I asked him where he got them from and he said Mr. Sherman gave them to me. I knew that Mr. Sherman owed money to Vaughn for some bad checks and a gas bill and I also knew [that] Mr. Sherman had also given other people calves because when I worked down there he gave me calves so that I didn't think nothing of it. I went with [them]."

The following is Stanton's testimony concerning the incident at Brown's barn:

"Q. The three of you [Stanton and the appellants] went in Mr. Howell's car down to Mr. Dale Brown's barn?

"A. Yes.

"Q. ...where did you park?

"A. Well, when we got there, Vaughn stopped and he let Gerry [Hinkley] out and he went down the road, turned around and came back.

"Q. Where did Vaughn stop?

"A. There right beside the barn ....

"A. ...He went down, turned his car around and shined his lights up to the milk house and Mr. Howell and myself, we also went into the barn ....

"Q. Was anything discussed in the barn?

"A. There was nothing said."

The three men then left, drove to Sherman's farm, picked up Hinkley's truck and horse trailer, and finally drove back to Brown's barn. They parked near the barn and left the car lights on. While Stanton was leading Brown's cow out of the barn, she bolted, entangling Stanton in the rope and dragging him through the cornfield. After they subdued the cow, they took her to the truck and loaded her into appellant Hinkley's horse trailer. They then drove to Sherman's barn and loaded the four calves into the trailer.

At that point, appellant Hinkley offered to pay Stanton for his assistance. Stanton stated that "I told him I didn't want anything because I was doing this as a favor for Vaughn, because I did owe him $15 or $16." Appellant Howell then drove Stanton back to South Montrose; appellant Hinkley left with the cattle in his truck. headed for his home in New York.

Several relevant facts were elicited on cross-examination:

"Q. Where were you when Mr. Howell came to you and said he wanted to go load some cows?

"A. Inside [Red's Diner].

"Q. Who was present when he made this statement?

"A. I don't know ....

"Q. ...there were other people — this statement was made out in the open?

"A. Yes ....

"Q. What kind of voice did he make this in?

"A. The way he usually talks.

"Q. Was it a clear statement that you would go help him load some cows?

"A. Yes.

"Q. Was this said out in the open and where there were people who obviously could hear it?

"A. Yes.

"Q. There was no attempt at concealing it then, was there?

"A. No."

Stanton also indicated that when appellants went to Brown's barn, they were specifically looking for the Charolais cow:

"Q. Is that what took place on the inside that you were looking for this brown cow?

"A. Yes.

"Q. Were there other cows in there?

"A. Yes.

"Q. How many were in there, can you guess?

"A. Ten or twelve calves."

Stanton also testified that during the evening, he saw a check for $150, signed by appellant Hinkley, in appellant Howell's possession. Finally, he stated that appellant Howell intended to stop at Sherman's house; upon seeing the house unlit, however, they chose merely to take the four calves and drive on.

Pennsylvania State Trooper Cobb testified concerning the facts leading to the arrest of the appellants:

"... I called the [New York] State Police from Mr. Brown's farm. I had gathered information there that Mr.

Hinkley and Mr. Howell and Stanton were seen together in the South Montrose area. Mr. Hinkley had in his possession a truck with a trailer and it was later seen in the area of Lynn. From this description we obtained where Mr. Hinkley lived at Route 193, Alpo, New York. I then called the Kirkwood State Police and asked for the station which would be closest to this area. I was informed of the Selkirk State Police Barracks. I then immediately called the Selkirk State Police Barracks and told them that we had a theft of four Holstein calves and a large brown cow which was a Charolais." The Commonwealth also presented testimony of two New York State Police officers which detailed the discovery of the cattle in Selkirk, New York, and the arrest of appellant Hinkley. Counsel for each appellant demurred to the evidence at the close of the Commonwealth's case. The court denied the demurrers.

After the denial of the demurrers, the appellants presented the following defense: that Sherman owed appellant Howell money for masonry and carpentry performed by Howell; that around August 1, they had discussed payment of the debt in the presence of several friends, that he needed the money in order to make support payments to his wife. He testified that "[Sherman] told me he had some cattle about a mile up from his house a bunch of calves in there and he told me I could have my pick of four calves in there .... [He] told me to pick my four. I explained to him that the four calves wouldn't cover my debt that I owed and I asked him if he couldn't give me a beef cow or something to help me out. I had the understanding that this brown Charolais was his at Brown's barn, from the conversation there that night." When he met appellant Hinkley on the evening of August 18, he told Hinkley that he needed money immediately to make a support payment to his wife. Hinkley agreed to purchase the cattle, $150 down, the remaining $450 two weeks later. Howell said that they initially stopped at the two barns before loading the

cattle so that Hinkley could decide whether he wanted to purchase them. Howell's account of the events of August 18, and 19, was corroborated by Hinkley and by Roy Walters, who overheard the conversation between Howell and Sherman. Thus, appellants attempted to show that they did not have the requisite intent to commit burglary.

The portions of the lower court's charge relevant to intent are as follows: "This is the indictment and it is basically following the words of the statute. One statute, the burglary section says: a person is guilty of burglary if he enters into a building ... with the intent to commit a crime therein unless the premises are at the time open to the public or the act [or] is licensed or privileged to enter." The court did not define intent. Later in the charge, the court stated that "... [t]he Commonwealth say [sic] these defendants went to the barn of Mr. Sherman and Mr. Brown respectively and they took from those barns cattle belonging to Mr. Sherman and Mr. Brown.

"If you accept the testimony as it has been presented and you believe what the Commonwealth has told you then, of course, they have established the crime of burglary and the crime of theft, always remembering that the theft would be incorporated into the burglary itself ....

"I told you what the one side of the issue is that the Commonwealth says that these people went in and took cattle out of the barns and therefore they committed a burglary."

After discussing the appellants' defense, the court commented that ". . . we are not talking about the actualities here. We are talking about intent. Did this and this is what the Commonwealth has got to prove, that he Vaughn Howell took this cattle, this cow and these calves, with the mind of a thief. If he did, he is guilty. If he didn't though and if his belief is such that a reasonable man could entertain, if that belief was reasonable, then of course you don't have the necessary

intent or mind of a thief to deprive the owner thereof."

Counsel then submitted additional points for charge, including the following point which tracks the language of §§302 and 304 of the Crimes Code:[2] "A person is guilty of an offense unless he acted intentionally, knowingly, recklessly or negligent[ly] as the law may require with respect to each material element of the case. Ignorance or mistake to a matter of fact to which there is a reasonable explanation or an excuse is a defense if: 1. The ignorance or mistake negatives the intent, knowledge, belief, recklessness or negligence required to establish a material element of the offense or the law provides that the state of mind established by such ignorance or mistake constitutes a defense." The court read this charge to the jury verbatim. There was no explanation that burglary requires intent and that the jury could not convict if appellant had acted only recklessly or negligently.

The case was then submitted to the jury. After three hours of deliberation, the jury returned and the following statement appears on the record: "[BY THE COURT]: Members of the Jury — Gerald Hinkley, guilty of the Brown cow, Not guilty of the other counts.

"Vaughn Howell, guilty of Mr. Brown's cow, Not guilty of the other counts. This is a[n] incongruous verdict, ..."[3] The court then ordered the jury to retire again to clarify its verdict. Thereafter, the jury found appellants guilty of the burglary of Brown's barn.

Initially, Howell's appellate counsel contended that it was "reversible error for the court below to charge the jury that defendant should be found guilty if they found he acted recklessly or negligently with respect to each material element of the case." The Commonwealth

---

2. Act of December 6, 1972, P.L. 1482, No. 334, §1, eff. June 6, 1973; 18 Pa.C.S. §§302 and 304.

3. The verdict slip read "Guilty of Count 'B' (Burglary of Mr. Brown's Brown Cow) not Guilty of other counts."

responds that appellant's trial counsel *requested* the challenged point for charge. In a reply brief, appellant's counsel alleges that trial counsel was ineffective in improperly framing questions for charge.

The issue of ineffective assistance of counsel is properly before this Court because appellant is represented by new counsel on appeal. *Commonwealth v. Dancer*, 460 Pa. 95, 331 A.2d 435 (1975). The precise question for decision is whether the charge considered as a whole is "a fair and complete presentation of the issue and theories involved?" *Delp v. Heath*, 234 Pa. Superior Ct. 607, 340 A.2d 530 (1975); because, if the charge was inadequate to inform the jury of the law, counsel was ineffective in failing both to object after the charge and to supplement the charge with an appropriate point for charge.

In the case at bar, appellants were charged with burglary. They admitted the alleged acts; the defense went to negative the intent. It was thereby imperative for the jury to understand the requisite intent. Section 3502 of the Crimes Code provides that "[a] person is guilty of burglary if he enters a building ..., with intent to commit a crime therein ...." Section 302(b) defines "intentionally" as follows: "(1) A person acts intentionally ...when:

"(i) if the element involves the nature of his conduct or a result thereof, *it is his conscious object to engage in conduct or to cause such a result; ....*" (Emphasis added). That is, the Commonwealth must prove that an accused had "specific intent" to commit a criminal offense. See *Morissette v. United States*, 342 U.S. 246 (1952); *Commonwealth v. Bready*, 220 Pa. Superior Ct. 157, 286 A.2d 654 (1971); Jarvis, *Pennsylvania Crimes Code and Criminal Law*, Comment §302[4]; 10 P.L.E. Criminal Law §22.

---

4. The Comment, supra, states that "[b]oth 'recklessness' and 'negligence' bring the 'reasonable man' standard into criminal law. There would seem to be no way that this non-existent 'reasonable man' should be kept out the law, particularly since all persons in a

Judged in light of the definition of "intent" as required by §3502, the court failed to state the law adequately. The court read §3502 which states only that an offender must have the "intent" to commit a crime. The additional discussion of the Commonwealth's theory of the case did not elucidate the requisite intent. For example, the court stated that "[t]he Commonwealth say [sic] these defendants went to the barn of Mr. Sherman and Mr. Brown respectively and they took from those barns cattle belonging to Mr. Sherman and Mr. Brown.

"If you accept the testimony as it has been presented and you believe what the Commonwealth has told you then, of course, they have established the crime of burglary and the crime of theft, ..." To the contrary, the mere proof that the appellants "took" the cattle, without more, would be insufficient evidence to prove the burglary. See *Commonwealth v. Garrett*, 229 Pa. Superior Ct. 459, 323 A.2d 314 (1974); *Commonwealth v. Hartland*, 147 Pa. Superior Ct. 263, 24 A.2d 160 (1942). The court stated that a burglar must have the "mind of a thief." The Commonwealth alleges that "the vivid expression 'mind of a thief' ... repeatedly utilized in the charge," was sufficient to define the requisite intent. That line of reasoning, however, is tautological. "Mind of a thief" is not self-defining, but is a term of art which in turn requires definition. A "thief" under §3921 of the Crimes Code, is one who "unlawfully takes, or exercises unlawful control over, movable property of another with *intent* to deprive him thereof." (Emphasis added.) Thus, to know a thief, the jury had to know what it meant to have an intent. Again, the judge's charge failed to define intent, thereby leaving the jury free to substitute its own definition for an essential element of the offense.[5]

_____

responsible society should be required to act in an appropriate manner."

5. Not only did the court's charge fail to define intent, but it also implied that an accused, in forming intent, must be judged by the reasonable man standard: "... this is what the Commonwealth has got

Trial counsel apparently attempted to clarify the problem by submission of §302 as a point for charge. Section 302 provides that "... a person is not guilty of an offense unless he acted intentionally, knowingly, recklessly or negligently, *as the law may require*, with respect to each material element of the offense." (Emphasis added.) There was no further elucidation that §3502 requires specific intent. Thus, the jury was free to convict appellants even if the appellants negligently or recklessly believed that Howell owned Brown's cow.[6] We need not speculate whether the jury was confused by the court's charge in the instant case. Initially, the jury returned an incongruous verdict which I believe was caused by the infirm charge. As it appears in the record, the charge introduces wholly inaccurate mental elements into the crime of burglary. Because trial counsel's requested point for charge resulted in confusion of the jury and because counsel failed to submit an adequate charge on the issue of intent, I believe that appellant was denied effective assistance of counsel.

Therefore, I would reverse appellants' convictions and remand for a new trial.

SPAETH, J., joins in this dissenting opinion.

DISSENTING OPINION BY SPAETH, J.:

I join Judge HOFFMAN's dissenting opinion, that

---

to prove, that he Vaughn Howell, took this cattle, this cow and these calves, with the mind of a thief. If he did, he is guilty. If he didn't though and if his belief is such that a reasonable man could entertain, if that belief was reasonable, then of course you don't have the necessary intent ...." The court was confusing the defense of mistake under §304 with the statutory definition of intent. In the latter instance, an accused who acts *unreasonably* may be innocent if he does not act *intentionally*.

6. Trial counsel submitted other points of charge; none of these were intended to explain the meaning of specific intent or the relevant test under §302(a).

appellant Howell should be awarded a new trial. I would also award a new trial to appellant Hinkley.

Granted that the doctrine of fundamental error is no more. Still, when two defendants are tried together; when the same error is made as to both defendants; when the attorney for each defendant is incompetent and therefore fails to protect the record; and when on appeal the new attorney for one defendant points out the error, and accordingly wins a new trial for his client; in these circumstances I think it does no great violence to *Clair* or *Dancer* to award the other defendant a new trial too. He will get it as soon as he gets competent counsel, in a PCHA hearing. I would give it to him now.

HOFFMAN, J., joins in this opinion.